# United States Court of Appeals for the Fifth Circuit

_____

No. 23-30315

_____

United States Court of Appeals
Fifth Circuit

**FILED**

July 23, 2024

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellee*,

*versus*

Joseph Boswell, Sr.,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:18-CR-162-1

_____

Before King, Ho, and Engelhardt, *Circuit Judges*.

Kurt D. Engelhardt, *Circuit Judge*:

This appeal follows a jury verdict finding Defendant Joseph Boswell guilty of bankruptcy fraud, in violation of 18 U.S.C. § 152(1), and tax evasion, in violation of 26 U.S.C. § 7201. Boswell contends that his bankruptcy-fraud conviction (Count One) was untimely and that the conviction must be reversed. He also argues that the Government's evidence at trial as to both counts impermissibly deviated from the charges as stated in the indictment; or alternatively, that the Government's evidence was insufficient for conviction. Finally, he contends that the district court lacked jurisdiction to order restitution as a condition of supervised release while an appeal is

pending. For the following reasons, we REVERSE as to Count One and otherwise AFFIRM.

## I. Factual Background

Boswell operated a business that cleaned and serviced pizza ovens for restaurant chains nationwide. Around 1995, Boswell stopped reporting his income and paying his taxes. When Boswell later filed for bankruptcy in 2011, he claimed to owe $751,000 in back taxes to the IRS covering the years 2001 through 2010.

While the IRS investigated Boswell and began enforcement efforts in the 2000s, Boswell operated his pizza oven services through various corporate entities. For example, in 2001, Boswell incorporated Bosco Services Group, LLC. Boswell also worked for Franchise Services Group, Inc., which was owned by Marcia Boswell, his then-wife, and Howard Wells, a childhood friend who had loaned him money. Wells claims that Boswell established Franchise Services Group with Marcia and Wells as owners to ensure that Marcia would receive an allowance and that Wells would be paid the money he was owed. This explanation is corroborated by a letter Boswell sent Wells sometime after 2008, in which he wrote that he formed Franchise Services Group to "make [Wells] and Marcia happy" and so that he could be "held accountable."

Boswell faced several financial setbacks throughout the 2000s. After Hurricane Katrina, Boswell's revenue decreased, and some of Boswell's crew members began working directly with pizza franchises, which cut off Boswell's business. In 2007, after Wells sought a judgment against Boswell for $177,000 of debt, Boswell and Wells signed a promissory note to schedule Boswell's payment of this amount plus interest. In 2008, Marcia filed for divorce, resulting in a consent judgment that required Boswell to pay $1,000

per month for ninety months for Marcia's share of the equity of their home on Horseshoe Drive in Alexandria, Louisiana (the "Horseshoe house").

Following the divorce, Boswell began working for Patriot Green Technologies, Inc. ("Patriot Green"), which was incorporated in 2008 in the name of Boswell's sister, Brenda Murphy. The Horseshoe house, where Boswell, Murphy, and Murphy's husband lived, served as Patriot Green's corporate headquarters. The Government alleges that Murphy only nominally owned Patriot Green and that Boswell used the corporate entity to evade debt owed to the IRS and other creditors. In support of this theory, the Government references the aforementioned letter that Boswell wrote to Wells, in which he admitted that a levy from the IRS caused Boswell to "move things to a corporate structure that takes things out of my direct control in order to protect my ability to have income move to you instead of to [the IRS]." At trial, Wells testified that when he confronted Murphy about her role at Patriot Green, she admitted that "[Boswell] was running everything and set everything up and handling all that" and that her name was "just put . . . on the paperwork to help him out."

Notably, as of 2010, Boswell did not have any bank accounts in his name. Patriot Green, on the other hand, maintained multiple business accounts, with Murphy and Tracy Boswell, Boswell's current wife, as the account signatories. These accounts received hundreds of thousands of dollars in revenue between 2011 and 2013. During that same period, hundreds of thousands of dollars were withdrawn from these accounts in cash. The Government highlighted Patriot Green business account #7472, which had debit cards issued to Murphy, Tracy, and Boswell. From 2011 to 2013, Boswell spent from $48,401.71 to $98,011.42 annually using this card, including thousands of dollars spent on vacation expenses. Boswell also had several debit cards linked to a Green Dot Bank deposit account, which was

funded through deposits from Patriot Green and was used to make personal purchases.

Shortly after Patriot Green was incorporated, Boswell lost the Horseshoe house in foreclosure. In September 2011, Boswell filed a voluntary petition for Chapter 7 bankruptcy. He reported total liabilities of over $1.6 million, including the $751,000 owed to the IRS in back taxes, and he reported $17,500 in total assets. When listing his personal property, Boswell reported that he had no value in any checking, savings, or other financial accounts; no interests in partnerships or other joint ventures; no accounts receivable; and no licenses, franchises, or other general intangibles. He also reported wages of $950 per month as an employee of Patriot Green.

In 2012, while Boswell's bankruptcy case was pending, Cheswell Unlimited, LLC was incorporated in the name of Lonnie Chestnut, Boswell's friend and business associate. Boswell began negotiating the repurchase of the Horseshoe house, informing the house's owner that the house would be titled to Cheswell Unlimited. Ultimately, the deal between the house's owner and Cheswell Unlimited fell through. However, Boswell was permitted to move into the Horseshoe house, and Patriot Green cut checks labeled "rent" to the house's owner.

In January 2013, Frances Hewitt, an attorney for the Office of the U.S. Trustee, interviewed Boswell as part of his bankruptcy case. When asked why he "put [Patriot Green] in Mrs. Murphy's name," Boswell responded:

> I have—as you probably know, I've got a ton of back taxes to settle, which I was trying—I was working with the IRS to work on a settlement before I filed bankruptcy and they told me once I filed, that we just had to put the brakes on all that until this was over with. So one of the concerns I did have was starting another entity where I had to go get bank accounts and everything else and try to start again with almost nothing and

have the IRS—I heard plenty of horror stories, the IRS just seizing everything, so I was fixing to be dead in the water.

In March 2013, still while Boswell's bankruptcy case was pending, Tiki Pizza, LLC was incorporated in the names of Murphy and Boswell's son, Joseph Boswell Jr., who was still in high school. Boswell closed on the sale of the Horseshoe house, and the sale was recorded in Tiki Pizza's name. In May 2013, Ambient Solutions, LLC was incorporated in Murphy's name. The Government claims that Ambient Solutions was yet another one of Boswell's nominee businesses.

On August 29, 2013, the bankruptcy court issued a judgment denying Boswell a discharge. Boswell's bankruptcy case was closed on October 29, 2013.

## II. Indictments and Pre-trial Motions

On July 13, 2018, the Government obtained a single-count indictment against Boswell for "Concealment of Assets" in violation of 18 U.S.C. § 152(1). The indictment alleged that Boswell "did knowingly and fraudulently conceal property belonging to" the bankruptcy estate, specifically "fees earned from nominee businesses and service contracts, from the trustee charged with control of the debtor's property and from the creditors and the United States Trustee." The Government, without providing any reasoning in support, filed a motion to seal the indictment until Boswell's arrest. The magistrate judge ordered the sealing of the indictment that same day. The parties agree that this original indictment was sealed one month before the five-year statute of limitations for a bankruptcy-fraud charge against Boswell was set to expire on August 29, 2018. *See* 18 U.S.C. § 3282.

On February 28, 2019, the Government obtained a two-count superseding indictment. The "Concealment of Assets" count (Count One)

was relabeled "Bankruptcy Fraud," alleging Boswell fraudulently concealed "monies earned from nominee businesses and service contracts." Count Two of the indictment, "Attempt to Evade and Defeat Payment of Tax," in violation of 26 U.S.C. § 7201, alleged that "[o]n or about September 22, 2011, continuing until August 29, 2013," Boswell "did willfully and knowingly attempt to evade and defeat the collection of income taxes due and owing by him to the United States of America for the calendar years 2001 through 2009 by concealing and attempting to conceal from the IRS the nature and extent of his assets and the location thereof, in placing funds and property in the names of nominees." Again, the Government moved to seal the indictment without explanation, and the magistrate judge granted the Government's request. Thereafter, the district court granted the Government's motion to unseal the indictments on March 20, 2019, and Boswell was arrested that same day.

On July 1, 2019, Boswell filed a motion for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f). Boswell argued that he could not adequately prepare a defense on either count of the indictment. Boswell requested a bill that would require the Government to disclose: (1) "exactly what property was alleged to have been concealed from the bankruptcy estate"; (2) "exactly when, where, and how it is alleged Boswell concealed the property identified"; (3) "exactly what funds and property Boswell is alleged to have placed in the names of nominees"; and (4) "the 'affirmative act' that Boswell is alleged to have committed in order to evade or defeat assessment of income taxes." In response, the Government asserted that discovery disclosures sufficiently apprised Boswell of the theory of the Government's case against him. The district court agreed with the Government and denied Boswell's request, reasoning that "Boswell can make the requests he outlines . . . as to the requested bill of particulars through the discovery process."

No. 23-30315

Also on July 1, 2019, Boswell moved to dismiss Count One of the indictment. Boswell argued that, because the Government lacked a legitimate purpose for sealing the original indictment, the statute of limitations was not tolled by sealing, and therefore, Count One was untimely when the indictment was unsealed on March 20, 2019. Boswell further argued that even if the Government had a legitimate reason to seal, the statute of limitations was not tolled because Boswell was prejudiced by the Government sealing the indictment. Specifically, Boswell argued that because he was kept in the dark about the bankruptcy-fraud indictment, he was unable to instruct his bankruptcy attorney to preserve his client file, which could be destroyed five years after the termination of the representation. The client file was indeed destroyed, erasing evidence that Boswell could have used to establish an absolute defense of good faith reliance on advice of counsel.

The Government asserted the following "legitimate prosecutorial purpose" for sealing in response to Boswell's motion:

> As the investigation developed, the government identified potential co-conspirators that required further investigation and approval . . . . A pattern of conduct identified in the bankruptcy fraud investigation showed that the potential co-conspirators were a component part of the scheme to defraud and assisted the defendant in creating nominal businesses to hide assets and income obtained by him. Therefore, leaving the indictment unsealed would potentially alert the co-conspirators.

The Government further contended that any exculpatory evidence contained in the destroyed case file could be found in alternative sources, so Boswell was not actually prejudiced. Again, the district court agreed with the Government and denied Boswell's motion, concluding that the Government

had established a "legitimate prosecutorial objective in sealing the indictment."

The district court also granted a series of continuances for the trial date. The trial was originally set for January 3, 2022, but the district court granted the Government's request for a continuance to accommodate the medical needs of a witness, and the trial was reset to June 13, 2022. Then, during April and May of 2022, the Government disclosed new evidence. Boswell moved to exclude any evidence disclosed after January 2022 under Federal Rule of Criminal Procedure 16, or alternatively to continue the trial to provide Boswell an opportunity to review the newly disclosed evidence. The district court granted Boswell's continuance motion and set the trial for September 12, 2022.

### III. Jury Trial and Sentencing

During the six-day jury trial in September 2022, the Government alleged that Boswell used corporate entities nominally owned by family members to conceal his assets from both bankruptcy creditors and the IRS. It called as witnesses employees of the U.S. Trustee's Office and the IRS who investigated Boswell. It also called Boswell's ex-wife, Marcia, who testified about Boswell's use of multiple corporate entities to carry out his business, and creditor Wells, who testified about Boswell's use of corporate entities to evade the IRS.

Conversely, Boswell's attorney relied on the testimony of Brenda Murphy and Boswell's son, who testified that they were the legitimate owners of the businesses. Boswell further argued, especially during closing argument, that any inaccuracies in Boswell's bankruptcy petition should be attributed to his attorney Christian Chesson, who had previously been sanctioned by a bankruptcy court.

Boswell moved for a judgment of acquittal both at the end of the prosecution's case-in-chief and at the end of trial, and the district court denied the motion both times. Following deliberations, the jury convicted Boswell on both counts.

The probation office released its presentence report on November 10, 2022. As relevant to this appeal, Boswell objected to the use of "intended loss" to calculate the loss amount under U.S.S.G. § 2B1.1, arguing that "intended loss" is an agency interpretive rule in the guidelines commentary that cannot be used to expand the plain definition of loss.

The district court sentenced Boswell to sixty months' imprisonment and three years of supervised release. The district court declined to decide the issue of restitution at Boswell's sentencing hearing, electing to receive briefing from the parties on the issue and reach a decision at a later hearing. Boswell filed his initial notice of appeal on May 9, 2023. At the subsequent restitution hearing on June 27, 2023, the district court ordered Boswell to pay $646,259.70 in restitution to the IRS as a condition of supervised release. Boswell filed another notice of appeal from that order on July 6, 2023.

## IV. Analysis

Boswell raises six issues on appeal: (1) whether the district court erred by failing to dismiss Count One as untimely under the statute of limitations; (2) whether the district court erred in denying Boswell's request for a bill of particulars; (3) whether sufficient evidence existed to sustain Boswell's convictions on both counts; (4) whether the district court erred in relying on the commentary to the sentencing guidelines to increase Boswell's offense level using the concept of intended loss; (5) whether the district court lacked jurisdiction to issue an amended judgment imposing restitution payments while the appeal was pending; and (6) whether the accumulation of errors throughout the proceeding requires reversal of the jury verdict. Boswell

concedes that his argument as to issue (4) is foreclosed by this court's decision in *United States v. Vargas*, 74 F.4th 673 (5th Cir. 2023) (en banc). The remaining five issues are discussed in turn below.

a. Whether the district court erred by failing to dismiss Count One as untimely under the statute of limitations.

Boswell argues that Count One of his indictment was untimely because it was unsealed on March 20, 2019, more than six months after the five-year statute of limitations expired on August 29, 2018. While he acknowledges that sealing an indictment can typically toll the statute of limitations, Boswell argues that the district court erred in concluding that the Government properly sealed the indictment so as to toll the statute of limitations in his case. Boswell's argument has three parts: (1) the district court violated this court's precedent in *United States v. Sharpe*, 995 F.2d 49 (5th Cir. 1993), by failing to hold a hearing after Boswell challenged the legitimacy of the Government's reasons for sealing; (2) the Government lacked a legitimate purpose for sealing the original indictment on July 13, 2018; and (3) even if the indictment was properly sealed, the statute of limitations was not tolled because Boswell has made a showing of "substantive and actual prejudice." Boswell also adds that, if this court reverses his conviction as to Count One, he is entitled to a new trial on Count Two because (1) the two counts of his conviction were "inextricably bound up," *United States v. Plyman*, 551 F.2d 965, 967 (5th Cir. 1977); (2) most of his trial was dedicated to Count One; and (3) the trial contained significant prejudicial evidence from the bankruptcy proceedings that would be inadmissible in a trial containing only Count Two.

### i. Standard of Review

This court reviews the district court's findings of fact in relation to the statute of limitations for clear error and its legal conclusions de novo.

No. 23-30315

*United States v. McMillan*, 600 F.3d 434, 443–44 (5th Cir. 2010). Where a defendant fails to properly preserve an issue for appeal, however, this court applies the plain-error standard of review. *United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002). Plain error requires: (1) an error or defect that has not been intentionally relinquished or abandoned; that is (2) clear or obvious, rather than subject to reasonable dispute; and (3) affected the claimant's substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If these criteria are met, this court has discretion to remedy the error if it seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.*

### ii. Whether a hearing is required under Sharpe

Boswell argues that the district court erred in failing to hold a hearing on his motion to dismiss because *United States v. Sharpe* requires the district court to hold a hearing when a defendant challenges the legitimacy of the Government's reasons for sealing an indictment. As a preliminary matter, the Government argues that this court should apply plain-error review because Boswell did not raise this issue to the district court. *United States v. Musa*, 45 F.3d 922, 924 n.5 (5th Cir. 1995).

Boswell cited *Sharpe* in his motion to dismiss Count One of the indictment, and he cited in a parenthetical the sentence in *Sharpe* that references a hearing. In context, however, it appears that Boswell cited *Sharpe* not to argue that a hearing was mandatory, but rather to support his argument that "[w]hen a defendant challenges the decision to seal an indictment after it has been unsealed, the burden is on the government to establish legitimate reasons for sealing the indictment." The Government is correct that Boswell's motion to dismiss Count One of the indictment does not advance the argument that *Sharpe* mandates a hearing in every instance, nor does the motion request a hearing at all. Accordingly, the district court

11

was never "fully apprise[d]" of Boswell's argument on appeal that *Sharpe* mandates a hearing on this issue, and thus plain-error review applies. *See Musa*, 45 F.3d at 924 n.5.

Boswell's *Sharpe* argument cannot succeed on plain-error review. In *Sharpe*, a group of defendants challenged indictments that were sealed within the statute of limitations, but unsealed five days after the statute of limitations had expired. *Sharpe*, 995 F.2d at 51. The defendants contended that the indictments were sealed for improper purposes and that the Government bore the burden of establishing the reasons for sealing. *Id.* at 51–52. This court joined other circuits by holding that "[i]f challenged, the government must explain and support the legitimacy of its reasoning for sealing the indictment." *Id.* at 52. To reconcile this holding with the principle that a magistrate judge is not required to make a contemporaneous record of the reasons for sealing an indictment, this court clarified that the Government is required to explain and support sealing the indictment "at a hearing *after* the indictment is unsealed." *Id.*

Since deciding *Sharpe* in 1993, this court has not had the occasion to revisit the decision or clarify its holding. And Boswell has not pointed to any authority indicating that *Sharpe* mandates a hearing in every instance when the Government is called to justify the sealing of an indictment. Ultimately, then, Boswell's inability to present any authority that clarifies or applies *Sharpe* is fatal to his argument. It would be difficult to contend that, "[n]otwithstanding the lack of precedent, it is plain from the face" of *Sharpe* that the decision mandated the district court to hold an evidentiary hearing on the Government's justification for sealing the indictment, even though Boswell never requested a hearing. *See United States v. Guillen-Cruz*, 853 F.3d 768, 772 (5th Cir. 2017). Accordingly, we hold that the district court did not commit plain error by failing to sua sponte hold an evidentiary hearing on this issue.

*iii. Whether the Government lacked a legitimate purpose for sealing the indictment*

In *Sharpe*, this court addressed the issue of whether "the statute of limitations ran . . . because the indictment, although returned within the limitations period, was not unsealed until five days after the limitations period had expired." 995 F.2d at 51. The court held that "a properly sealed indictment does indeed toll the statute of limitations, absent a showing of substantive and actual prejudice." *Id.* at 50. We read *Sharpe* to hold that (1) an improperly sealed indictment does not toll the statute of limitations; and (2) even a properly sealed indictment will not toll the statute of limitations if the defendant can show substantive and actual prejudice.

To determine whether the indictment was properly sealed and thus tolled the statute of limitations, the court first must consider whether the indictment was sealed for any legitimate prosecutorial objective or where the public interest required it. *See id.* at 52. In its response to Boswell's motion to dismiss Count One of the indictment, the Government proffered the following justification for sealing:

> As the investigation developed, the government identified potential co-conspirators that required further investigation and approval . . . . A pattern of conduct identified in the bankruptcy fraud investigation showed that the potential co-conspirators were a component part of the scheme to defraud and assisted the defendant in creating nominal businesses to hide assets and income obtained by him. Therefore, leaving the indictment unsealed would potentially alert the co-conspirators.

The Government argues that it had a legitimate interest in sealing an indictment "to further an investigation," citing in support *United States v. Lakin*, 875 F.2d 168 (8th Cir. 1989), *United States v. Bracy*, 67 F.3d 1421 (9th Cir. 1995), and *United States v. Edwards*, 777 F.2d 644 (11th Cir. 1985).

In *Lakin*, the Government asserted before the district court "that it asked the magistrate to seal the indictment because although it had probable cause to indict defendants, it needed more time to gather additional evidence to determine whether the case should be pursued." 875 F.2d at 170. The defendants, notably, did not contest that the Government's reason for sealing was legitimate; instead, they argued that an indictment may be sealed only to facilitate an arrest. *Id.* The Eighth Circuit affirmed that "the indictment in question was sealed for a legitimate prosecutorial objective." *Id.* at 171.

In *Bracy*, the Government proffered three reasons for sealing the indictments: (1) there was an ongoing investigation of a narcotics manufacturing and distribution organization; (2) some delay was necessary as the IRS joined the investigation to investigate financial crimes; and (3) the violent nature of the criminal organization, and the need to protect the safety of potential witnesses, justified sealing. 67 F.3d at 1426. The Ninth Circuit concluded that the district court did not abuse its discretion by accepting these reasons and denying the defendants' motion to dismiss. *Id.* at 1426–27.

In *Edwards*, the Government unsealed a superseding indictment sixteen days after the expiration of the five-year statute of limitations. 777 F.2d at 647. The Eleventh Circuit acknowledged that the Government's only reason for filing the original indictment may have been "to toll the running statute of limitations." *Id.* at 648. Nevertheless, the Government had engaged in a "colloquy" with the magistrate judge to support its motion to seal the indictment, and the magistrate judge granted this motion notwithstanding the court's concern that the indictment was merely a vehicle to toll the statute of limitations. *Id.* at 648–49. The Eleventh Circuit affirmed, giving "great deference to the discretion of the magistrate," and noting that "[t]olling the statute of limitations on charges of conspiracy to import with intent to distribute thousands of pounds of marijuana is arguably required by the public interest and supported by sound reasons of policy." *Id.*

We are not persuaded by the Government's cited case law here. *Bracy* involved the Government's investigation of ongoing criminal activity; here, the Government indicted Boswell for bankruptcy fraud in July 2018, although Boswell's bankruptcy case concluded in 2013. *Edwards* centered on deference to the magistrate judge's decision to seal, but its reasoning is less applicable in a case such as this, where the Government presented no justification for sealing to the magistrate judge. *Lakin* presents a closer call, but the Government here has not claimed that it had probable cause at the time of the indictment and needed more time to gather additional evidence to determine whether a case *against Boswell* should be pursued. *See also United States v. Benavides*, No. CR 06-62-M-DWM, 2009 WL 10679152, at *8 (D. Mont. Dec. 15, 2009) (rejecting same authority cited by Government).

On the other hand, *United States v. Gigante*, 436 F. Supp. 2d 647 (S.D.N.Y. 2006), upon which Boswell relies, presents comparable facts to those in Boswell's case. In *Gigante*, the Government issued and sealed its first indictment, which charged the defendant with one count of making a false statement in a bankruptcy proceeding, one day before the statute of limitations was set to expire. *Id.* at 650. The final superseding indictment, which was unsealed twenty-one months later, contained ten counts, alleging bankruptcy fraud, concealment of assets, false statements, and tax evasion. *Id.* at 650–51. The Government did not inform any of the magistrate judges of the basis for its requests for sealing. *Id.* at 652. At a hearing to respond to the defendant's motion to dismiss the indictments, however, the Government proffered several reasons for sealing, contending that: (1) putting the defendant on notice of fraudulent concealment and false statement charges would have compromised a broader, ongoing tax evasion investigation; (2) the DOJ and the IRS needed more time to complete a mandated review of the tax evasion charge; (3) the Government needed more

time to conduct an investigation to support the forfeiture of the defendant's assets; and (4) the defendant posed a flight risk. *Id.* at 652–53.

The *Gigante* court was not persuaded by the Government's arguments that it needed to maintain secrecy or avoid a flight risk. The defendant was well aware that the Government was investigating him, and there was no indication that the defendant would flee or be difficult to track. *Id.* at 657. The court surmised that the genuine reason that the Government sealed the indictments was to toll the statute of limitations while it carried out a broader investigation into related crimes. *Id.* at 657–58. The court then rejected the notion that "the need for additional time to decide whether to bring an additional charge" is a legitimate prosecutorial purpose that justifies the sealing of an indictment. *Id.* at 658. Such reasoning would undermine the purpose of having a statute of limitations at all. *Id.*; *see also Toussie v. United States*, 397 U.S. 112, 114–15 (1970) ("The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. . . . Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity."). The court went on to state that "the existence of a five-year statute of limitations would have little or no meaning if the Government could extend it, essentially unilaterally, merely because it wanted more time to investigate a potential related charge." *Gigante*, 436 F. Supp. 2d at 658. "The Government would be able to file a sealed indictment whenever more time for investigation might strengthen its case, and no person under investigation would ever have repose, as he could never be certain that he had not been indicted months or even years earlier." *Id.* The district court accordingly granted the defendant's motion to dismiss the indictments. *Id.* at 660.

We agree with Boswell and the principles laid out in *Gigante*, and hold that the Government failed to establish a legitimate prosecutorial purpose for sealing the indictment. The most troubling aspect of the Government's action in this case is that, despite its burden to "explain *and support* the legitimacy of its reasons for sealing the indictment," the Government has undertaken very little effort to support with evidence that its justifications are in fact legitimate. *See Sharpe*, 995 F.2d at 52 (emphasis added). As Boswell explains, there is good reason to be skeptical about the Government's purported concern with "alert[ing] the co-conspirators." Each of Boswell's alleged co-conspirators—specifically Brenda Murphy, Tracy Boswell, and Joseph Boswell Jr.—testified in front of the grand jury in connection with the Government's investigation of Boswell. It is also unclear why the Government needed additional time to investigate co-conspirators in Boswell's bankruptcy fraud in 2018, five years after the bankruptcy court issued a judgment denying Boswell a discharge. Recall that in January 2013, an attorney for the Office of the U.S. Trustee thoroughly questioned Boswell about his alleged nominee companies and co-conspirators. Yet the Government provided no insight as to the timing of the grand jury examinations or the progress of the investigation into the alleged co-conspirators.

The Government has provided *no* evidentiary support for its proffered justifications; it submitted no affidavits or other record evidence that would permit the court to substantively evaluate the Government's prosecutorial objectives in sealing. This court cannot ascertain from the record: (1) which co-conspirators the Government identified that required investigation beyond 2018; (2) whether the Government needed to investigate these co-conspirators to investigate Boswell's case, or whether the Government was considering adding these individuals as co-defendants; or (3) whether the investigative efforts undertaken by the Government would have been

compromised if these co-conspirators had been alerted of an indictment. The Government's lack of support in this case stands in stark contrast to *Lakin*, 875 F.2d at 169, where the district court held a hearing on the matter and the Government put forth actual evidence in support of its arguments. Here, where the Government has so obviously failed to provide justification for sealing the indictment, we cannot sanction the sealing as proper. We hold that the Government failed to demonstrate a legitimate prosecutorial purpose for sealing the indictment, which in turn failed to toll the statute of limitations. The indictment was untimely under the statute of limitations, and Boswell's conviction under Count One is reversed.

Because we hold that the Government failed to demonstrate a legitimate prosecutorial purpose for the sealing, we do not need to address Boswell's "substantive and actual prejudice" arguments. The Government argued at oral argument and in a subsequent Rule 28(j) letter that Boswell must show *both* improper sealing and actual prejudice under *Sharpe* to succeed on his statute of limitations argument. We decline to embrace the Government's reading of *Sharpe*. *See supra* at 13. It is sufficient that the Government failed to demonstrate a legitimate purpose for sealing the indictment, such that Boswell's conviction on Count One is reversed.

### iv. Whether a new trial is warranted for Count Two

Given our decision that Boswell's Count One conviction must be reversed, we turn now to Boswell's contention that his Count Two conviction must also be vacated and a new trial granted. Boswell cites *United States v. Plyman*, 551 F.2d 965, 967 (5th Cir. 1977), to support his argument that the two counts of his conviction were "inextricably bound up" and that "the potential for prejudice on the latter count[] was acute." Boswell contends that the Government's bankruptcy-fraud charge dominated the trial and that the evidence solely related to bankruptcy fraud, including the

testimony of his ex-wife Marcia and creditor Wells, would be inadmissible and prejudicial in a trial based solely on Count Two. Thus, according to Boswell, where Count One falls, Count Two must fall as well.

Generally, this court addresses the concept of "spillover" prejudice within the context of a district court denying a motion for severance. *United States v. Edwards*, 303 F.3d 606, 639 (5th Cir. 2002). In *Edwards*, this court acknowledged that "perhaps a grant of a new trial might be appropriate in some cases of 'retroactive misjoinder.'" *Id.* at 640. For retroactive misjoinder to apply, "[a]t a minimum, drawing from our severance cases and authority from other circuits, the defendants must show that they experienced some prejudice as a result of the joinder of the invalid claims." *Id.* For instance, in *Plyman*, the primary authority cited by Boswell here, the defendant was convicted for violating multiple provisions of the Gun Control Act, including a provision that outlawed the sale or delivery of any firearm to any person who the seller knows or has reasonable cause to believe does not reside in the state in which the seller's place of business is located. 551 F.2d at 965, 966 n.1. This court held that the defendant's conviction under this provision was invalid, because the buyer and seller both actually resided in the same state. *Id.* at 966–67. The court decided to also vacate the defendant's conviction under a provision requiring firearm sellers to keep records, determining that the defendant's violations were "inextricably bound up," and that there was "acute" potential for prejudice on the defendant's conviction under the valid count. *Id.* at 967.

We disagree with Boswell that his convictions as to the two counts are inextricably intertwined. The prosecution's theory of the case was that Boswell used nominee entities to conceal his assets from bankruptcy creditors and the IRS. The testimony of Howard Wells, as well as Boswell's letter to Wells sent around 2008, helped the Government establish that Boswell specifically set up corporations like Patriot Green to keep his assets

out of the IRS's reach. The testimony of Hewitt, who interviewed Boswell during his bankruptcy case, similarly helped the Government establish that Boswell set up Patriot Green in his sister's name to avoid "the IRS just seizing everything." The testimony of Boswell's ex-wife, Marcia, primarily discussed Boswell setting up Franchise Services Group as a nominee business, which supported the Government's theory of the case for both the bankruptcy-fraud and tax-evasion charges. This evidence would therefore be admissible in a trial solely pertaining to Count Two, such that there was no unjustified taint of the Count Two conviction due to the simultaneous trial of Count One. *See United States v. Vebeliunas*, 76 F.3d 1283, 1294 (2d Cir. 1996) ("In cases where the vacated and remaining counts emanate from similar facts, and the evidence introduced would have been admissible as to both, it is difficult for a defendant to make a showing of prejudicial spillover." (internal quotation omitted)). Therefore, our decision regarding Count One's invalidity does not implicate the invalidity of Count Two.[1]

> b. Whether the district court erred in denying Boswell's request for a bill of particulars.

Boswell argues that the language of the superseding indictment was inadequate, and he advances three sub-arguments that the Government describes as "variations on the same theme": (1) the district court abused its discretion by denying his request for a bill of particulars; (2) the Government's trial evidence impermissibly varied from the indictment; and (3) the jury was allowed to convict Boswell for committing a crime in a materially different way than as alleged in the indictment, constituting a "constructive amendment" of the indictment.

---

[1] Because we hold that the conviction on Count One must be reversed, our remaining discussion of the issues raised by Boswell on appeal will concern only Count Two.

No. 23-30315

### *i. Bill of particulars*

"The purposes of a bill of particulars are to obviate surprise at trial, enable the defendant to prepare his defense with full knowledge of the charges against him, and to enable double jeopardy to be pled in case of a subsequent prosecution." *United States v. Mackey*, 551 F.2d 967, 970 (5th Cir. 1977). "It is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial." *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980). "The granting of a bill of particulars is addressed to the sound discretion of the trial court, . . . and the exercise of this discretion cannot be reversed on appeal unless the court concludes that the defendant was actually surprised at the trial and thus that substantial rights of his were prejudiced by the denial." *Mackey*, 551 F.2d at 970 (internal quotation omitted). Demonstrating reversible error in the denial of a motion for a bill of particulars is a "heavy burden." *United States v. Lavergne*, 805 F.2d 517, 520 (5th Cir. 1986).

The superseding indictment in this case had two counts. As relevant here, Count Two charged Boswell with tax evasion, alleging that Boswell "did willfully and knowingly attempt to evade and defeat the collection of income taxes due and owing to him . . . by concealing and attempting to conceal from the IRS the nature and extent of his assets and the location thereof, in placing funds and property in the names of nominees." The indictment alleged that Boswell engaged in this criminal conduct during his bankruptcy case, from September 2011 until August 2013. Before his trial, Boswell requested, and was denied, a bill of particulars.

The trial transcript simply does not give the impression that Boswell was "actually surprised" by any evidence presented by the Government. We agree with the Government that evidence related to the Green Dot and Patriot Green accounts was not part of a "bait and switch." This evidence fit

within the Government's theory of the case and the framework provided by the indictment. The indictment focuses on Boswell's alleged use of nominees to evade bankruptcy creditors and the IRS, and the evidence submitted by the Government supports its theory that Boswell had de facto control over the finances of nominee businesses like Patriot Green. Boswell's characterization of the Government's case as homing in solely on his Green Dot account and Patriot Green's cash withdrawals is misleading—these particular pieces of evidence are part of an extensive record of exhibits that covers other alleged nominee businesses and financial transactions. Further, Boswell has not alleged that he had insufficient time to review the Government's disclosed Green Dot and Patriot Green evidence, and during trial, Boswell's counsel effectively and thoroughly cross-examined the Government's witnesses on this evidence. And, in lieu of granting Boswell's motion for a bill of particulars, the district court pointed to his interview with Hewitt, which detailed the nominee businesses owned by his wife, son, and sister. This is not one of those rare cases where the district court abused its discretion in denying Boswell's request for a bill of particulars.

### ii. Variance

"A variance arises when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense." *United States v. Perez-Solis*, 709 F.3d 453, 465 (5th Cir. 2013) (quoting *United States v. Delgado*, 401 F.3d 290, 295 (5th Cir. 2005)). "A variance is material if it prejudices the defendant's 'substantial rights,' either by surprising the defendant at trial or by placing the defendant at risk of double jeopardy." *Id.* (quoting *United States v. Robinson*, 974 F.2d 575, 578 (5th Cir. 1992)).

The Government contends that plain-error review should apply to this issue, because Boswell raised the argument for the first time in a post-

conviction bail motion. *See United States v. Gevorgyan*, 886 F.3d 450, 456–57 (5th Cir. 2018) (applying plain-error review for an issue that was raised after the defendant's trial concluded); *Perez-Solis*, 709 F.3d at 465 ("We review a forfeited claim of material variance for plain error."). Regardless of what standard of review applies, however, Boswell's variance arguments are unconvincing. As discussed above, the indictment alleges that Boswell concealed assets through nominee businesses, and at trial, the Government used records from Green Dot and Patriot Green to establish that Boswell exercised control over Patriot Green's funds. This evidence indeed aligns with the charges as described by the indictment. Whether that evidence is compelling is a separate matter, discussed more fully below. Additionally, it is unlikely that Boswell's "substantial rights" were prejudiced by the introduction of pertinent evidence that Boswell appeared well-equipped to address. Therefore, no variance occurred.

### iii. Constructive amendment

"A constructive amendment occurs when the government changes its theory at trial, allowing the jury to convict on a broader basis than that alleged in the indictment, or when the government proves an essential element of the crime on an alternate basis authorized by the statute but not charged in the indictment." *United States v. Stanford*, 805 F.3d 557, 565 (5th Cir. 2015). Because Boswell did not contemporaneously object to the alleged constructive amendment of his indictment, the standard of review is for plain error. *United States v. Isgar*, 739 F.3d 829, 840 (5th Cir. 2014).

Boswell essentially rehashes his prior arguments in claiming constructive amendment, and his arguments are no more availing here than before. Regardless of whether the evidence was sufficient to convict, the jury was properly guided to reach a conclusion based on the indictment's language. The district court also explained the indictment and the elements

of each count to the jury. The jury was therefore not led to convict Boswell on a broader basis than that alleged in the indictment, and no constructive amendment occurred.

> c. Whether sufficient evidence existed to sustain Boswell's conviction.

Boswell next argues that there was insufficient evidence to convict him on Count Two, citing the testimony of Brenda Murphy and Joseph Boswell Jr., who testified that they did not receive assets or funds from Boswell. Boswell also claims that he could not have committed tax evasion during his bankruptcy case because his tax liabilities were non-dischargeable, and therefore, even a successful bankruptcy fraud could not defeat payment of his taxes.

Because Boswell's sufficiency-of-the-evidence claims were preserved through a Rule 29 motion, this court reviews his claims de novo, but "with substantial deference to the jury verdict." *United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018) (quoting *United States v. Delgado*, 672 F.3d 320, 330 (5th Cir. 2012)). "This court will uphold the jury's verdict if a rational trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt." *United States v. Green*, 47 F.4th 279, 287 (5th Cir. 2022). The evidence, as well as all reasonable inferences from that evidence, are reviewed in the light most favorable to the verdict. *Id.* This court does not "reweigh the evidence or assess the credibility of witnesses, as this is the responsibility of the jury." *Id.*

To convict Boswell on Count Two, the prosecution was required to establish: "(1) willfulness; (2) existence of a tax deficiency; and (3) an affirmative act constituting an evasion or attempted evasion of the tax." *Id.* at 292 (quoting *United States v. Bolton*, 908 F.3d 75, 89 (5th Cir. 2018)); 26 U.S.C. § 7201. The Government contends that "there was overwhelming

evidence—including defendant's own admissions—that defendant willfully evaded payment of taxes through affirmative acts that included the use of nominee entities." For instance, in a letter to Wells, Boswell admitted that he set up Patriot Green "to move things to a corporate structure" so that the revenue could pay off his debt to Wells instead of being subject to IRS collection. Boswell later admitted during his bankruptcy interview that he set up Patriot Green in his sister's name to prevent "the IRS [from] just seizing everything." Further, the Government argues that Boswell's tax liabilities being non-dischargeable in bankruptcy is irrelevant. The Government alleged that Boswell attempted to evade his non-discharged tax debt, which he carried out by, among other things, using Patriot Green funds for personal expenses during the bankruptcy period and utilizing nominee business Tiki Pizza to keep the Horseshoe house out of his name.

We agree that sufficient evidence existed to convict Boswell under Count Two. The Government showed that Boswell's cost of living at the Horseshoe house was paid by Tiki Pizza and other nominee companies. Boswell negotiated the purchase of this house during his bankruptcy (i.e., during the time period covered by the indictment), a fact that helped convince the district court that there was sufficient evidence for the jury to conclude that Boswell attempted to conceal the house as an asset by placing it in the name of a nominee. Further, because, per the Government's theory, Boswell formed Patriot Green to keep his assets out of the IRS's hands, a jury could conclude that Boswell's use of Patriot Green's funds during the period of the bankruptcy was also part of an ongoing attempt to evade taxes. We therefore decline to upset the jury's verdict where a rational trier of fact could conclude from all of the evidence presented that the Government met its burden beyond a reasonable doubt on Count Two.

d. Whether the district court lacked jurisdiction to issue an amended judgment imposing restitution payments while the appeal was pending.

Boswell argues that the district court lacked jurisdiction to impose restitution as a condition of supervised release after he filed his first notice of appeal. He claims that the district court's authority under 18 U.S.C. § 3664(d)(5) to hold open the issue of restitution does not provide any basis for the district court to revisit terms of supervised release already imposed. This court reviews the legality of such a restitution order de novo. *United States v. Maturin*, 488 F.3d 657, 659 (5th Cir. 2007).

While the parties do not cite Fifth Circuit authorities directly on point, the Government notes that courts addressing this issue have generally recognized that a notice of appeal does not deprive the district court of jurisdiction to modify the terms of supervision. Further, Boswell's claim that § 3664(d)(5) does not provide the district court with authority to revisit the terms of supervised release is inaccurate—a combination of statutes incorporates § 3664 into the district court's procedures for setting the terms of supervised release.

In *United States v. D'Amario*, 412 F.3d 253, 255 (1st Cir. 2005), the First Circuit addressed a defendant's claim that "the appeal of [a] 2003 district court judgment revoking his supervised release, in which he challenge[d] the validity of the imposition of special conditions of supervised release, divest[ed] the district court of jurisdiction to alter any aspect of his supervised release." The First Circuit disagreed, holding that pursuant to 18 U.S.C. § 3583(e)(2) and Federal Rule of Criminal Procedure 32.1(c), "the district court has plenary jurisdiction to supervise a convicted defendant's release, including the jurisdiction to modify the conditions of supervised release, even though an appeal from a revocation of supervised release may be pending." *Id.* at 255.

In *United States v. Ramer*, 787 F.3d 837 (7th Cir. 2015), the Seventh Circuit agreed with the First Circuit's conclusions in *D'Amario*. In *Ramer*,

the defendant argued on appeal that the district court erred by not conditioning his restitution payments on his ability to pay. *Id.* at 838. Before the Government filed its response brief, the district court amended the judgment to reflect that the defendant's obligation to pay $100 per month as a condition of his supervised release would be conditioned on his ability to pay. *Id.* Citing *D'Amario* favorably, the Seventh Circuit held that the district court retained jurisdiction to modify the defendant's conditions of supervised release while the appeal was pending, and it dismissed the defendant's appeal as moot. *Id.* at 838–39. The Ninth Circuit, in an unpublished memorandum opinion, similarly held that a defendant's appeal was mooted by the district court revoking the challenged condition of supervised release. *United States v. Caton*, No. 21-30168, 2022 WL 17547826, at *1 (9th Cir. Dec. 9, 2022).

We agree with our sister circuits who have had occasion to address this issue, and hold that the district court did not err in imposing restitution after Boswell filed his first notice of appeal. The district court specifically reserved ruling on this issue until further briefing could be conducted. Considering both the district court's authority to defer on ordering restitution and the district court's jurisdiction to modify conditions of supervised release during the pendency of an appeal, we affirm the district court's restitution order.

e. Whether the accumulation of errors throughout the proceeding requires reversal of the jury verdict.

Boswell argues that, taking his prior arguments altogether, the cumulation of errors in his trial justify reversal of his convictions. Under the "cumulative error" doctrine, an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can result in the denial of a defendant's right to a fair trial. *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012). Reversal is only justified in "rare

instances" where errors "so fatally infect the trial that they violated the trial's fundamental fairness." *Id.* at 344 (quoting *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007)). This court has described the possibility of cumulative error as "often acknowledged but practically never found persuasive," especially where the Government presents "substantial evidence of guilt." *Id.* (quoting *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc)).

As is evident from our prior discussion, no accumulation of errors exists to justify reversal of the judgment as to Count Two. And the only new issue Boswell raises in this section of his brief is that the Government ambushed him yet again by disclosing critical evidence at the eleventh hour. However, pursuant to the Federal Rules of Criminal Procedure, the district court can redress a Rule 16 violation by granting a continuance. FED. R. CRIM. P. 16(d)(2)(B). Even accepting as true Boswell's claim that a Rule 16 violation occurred, the district court redressed the issue by granting Boswell the continuance that he requested. Under these facts, and considering the exceptional nature of the cumulative error doctrine, we decline to reverse the jury's verdict as to Count Two.

### V. Conclusion

Accordingly, we REVERSE as to Count One and AFFIRM as to the remainder of the judgment.

JAMES C. HO, *Circuit Judge*, concurring in part and concurring in the judgment:

We are duty bound to grant relief to Joseph Boswell from his bankruptcy fraud conviction. This is no small matter, considering that the jury had good reason to convict on that count. (Boswell also remains convicted of tax evasion.) But I agree with my distinguished colleagues that the government lacked a valid basis for sealing his indictment. As a result, Boswell was denied the protection of the governing statute of limitations. Established law requires us to grant relief accordingly. Courts enforce the rights of the accused, not because we seek to free the guilty, but because we seek to protect the innocent. "It is for the protection of all persons accused of crime—the innocently accused that they may not become the victim of an unjust prosecution, as well as the guilty, that they may be awarded a fair trial—that one rule (as to public trials) must be observed and applied to all." *In re Oliver*, 333 U.S. 257, 271 n.25 (1948) (quoting *People v. Murray*, 89 Mich. 276, 286, 50 N.W. 995, 998 (1891)). *See also United States v. Kersee*, 86 F.4th 1095, 1100–02 (5th Cir. 2023) (Ho, J., concurring).

I write separately to note that I decline to join section IV.a.ii of the majority opinion. In *United States v. Sharpe*, 995 F.2d 49 (5th Cir. 1993), our court stated that, "[i]f challenged, the government must explain and support the legitimacy of its reasons for sealing the indictment. The government only does so, however, at a hearing *after* the indictment is unsealed." *Id.* at 52. This language seems to require a hearing. In addition, *Sharpe* cites cases from other circuits that likewise contemplate that defendants have a "right" to such a hearing. *See id.* at 52 n.10; *see also, e.g.*, *United States v. Lakin*, 875 F.2d 168, 171 (8th Cir. 1989) ("A defendant's right to challenge the propriety of the sealing is fully protected by affording him the right to a hearing *after* the indictment is opened to public inspection."); *United States v. Srulowitz*, 819 F.2d 37, 41 (2nd Cir. 1987) (same). But we ultimately need not decide this

29

issue here.   Whether or not Boswell was entitled to a hearing does not ultimately affect his appeal, because he is entitled to relief on other grounds—namely, that the government lacked a proper purpose for sealing the indictment, as explained in section IV.a.iii of the majority opinion, and as I've noted above.

Accordingly, I concur in part and concur in the judgment.